# In the United States Court of Federal Claims

No. 19-875L
Filed: July 21, 2023

**WELDON LOWERY,** *et al.*,

    *Plaintiffs*,

v.

**THE UNITED STATES,**

    *Defendant.*

*Thomas Scott Stewart* and *Reed Ripley,* Stewart, Wald, & Smith. LLC, Kansas City, MO, for Plaintiffs.

*Dustin Joseph Weisman*, Trial Attorney, Natural Resources Section, with *Todd Kimm,* Assistant Attorney General, Environment & Natural Resources Division, U.S. Department of Justice, Denver, CO, for Defendant.

## MEMORANDUM OPINION

**TAPP, Judge.** [1]

    The Fifth Amendment Takings Clause of the United States Constitution protects individuals from the deprivation of private property for public use without just compensation. Although the concept of a "taking" may appear straightforward, determining whether a genuine issue of material fact exists in a specific case can be complex. This is particularly true in the ever-changing landscape of rails-to-trails litigation. Since the Court can draw no inescapable conclusions from the record before it, the tracks lead to trial.

    Thirty-nine landowners, (collectively referred to as "Plaintiffs"), filed this takings case in 2019 based on The National Trails System Act, 16 U.S.C.A. §§ 1241 *et seq.* ("The Trails Act"). Plaintiffs' property interests collectively span fifty-three parcels of land adjacent to an abandoned railroad corridor in south central Alabama. Plaintiffs and the United States each seek summary judgment, purporting that the undisputed facts support their cause. The Court concludes that a genuine issue of material fact remains as to whether the railroad company would have abandoned the property had it not been for the United States' interference. Therefore, the

---

[1] The case was originally assigned to Judge Nancy B. Firestone and transferred to the undersigned on October 3, 2022. (*See* ECF No. 64, Case No. 19-756).

Court denies both parties' Motions for Summary Judgment, (Pls.' Mot. for Summ. J., ECF No. 70; Def.'s Mot. for Summ. J., ECF No. 72, Case No. 19-756).[2]

### I.     Background

#### A.     The Subject Rail Line and Attempt to Railbank



Here, Alabama Railroad Company, Inc. ("ALAB"),[3] owned an easement for railroad purposes from Flomaton to Tunnel Springs; the Rail Line runs through Escambia, Conecuh, and Monroe Counties, culminating in a distance of forty-seven and one-half miles (the "Line"). (Def.'s Mot. for Summ. J. Ex. 5, ECF No. 72-5; Third Am. Compl. at 3, ECF No. 15). The easement lays across fifty-three parcels of Plaintiffs' lands.[4] (Third Am. Compl. at 3).

On March 29, 2019, ALAB filed a notice of exemption to abandon rail service over the Line.

(DEF.'S MOT. EX. 2 AT 3).

---

[2] This case was previously consolidated with *Albertson v. United States*, Case No. 19-756, (ECF No. 24, pre-consolidation docket), but was put on a separate briefing schedule on November 1, 2022, to set a briefing schedule for causation. (*See* ECF No. 68, Case No. 19-756). The Motions for Summary Judgment at issue are docketed in that case, (ECF Nos. 70, 72, Case No. 19-756), pursuant to the Court's rules. However, the *Albertson* case was voluntarily dismissed, (ECF No. 79, Case No. 19-756), and the cases were subsequently unconsolidated. All future filings can be found docketed in Case No. 19-875. Citation to documents filed during consolidation will specify the case number where the documents can be found.

[3] Two relevant, similarly named railroad entities are at play here; they are apparently unrelated. The Court adopts the vernacular of the STB. Alabama Railroad Company, Inc., the easement holder until 2020, is referred to as "ALAB." Alabama Railroad, LLC purchased ALAB's interests in December of 2020; it is referred to as "ARL."

[4] Here, the United States disputes whether some owners own the underlying parcels in fee simple. (Def.'s Mot. For Summ. J. at 13 ("[The] United States made clear to Plaintiffs that it disagreed with their assertion that they possessed the requisite title to allege a takings claim in regards to 31 claims.")). This Opinion does not establish the property interests of any plaintiff; that issue is not before the Court. The United States has never conceded liability or stipulated to title in any portion of this corridor. (*Id.* at 13–14 n.8).

(Def.'s Mot. for Summ. J. Ex. 5 at 1 (ALAB Extension Request)). ALAB served and published the notice of exemption in the Federal Register on April 18, 2019. (*Id.* (citing Alabama Railroad Co.—Abandonment Exemption—in Escambia, Conecuh, and Monroe Counties, Alabama, 84 Fed. Reg. 16,310-01)). In its notice of exemption, ALAB certified that: (1) no local or overhead traffic had moved over the Line for at least two years; (2) any overhead traffic on the Line could be rerouted; (3) no user of rail service on the Line (or a state or local government entity acting on behalf of such user) had a formal pending complaint regarding cessation of service over the Line with the Surface Transportation Board ("STB") or any U.S. District Court nor had any complaint been decided in favor of a complainant within two years; and (4) the requirements delineated in 49 C.F.R. § 1105.12 (newspaper publication), 49 C.F.R. § 1152.50(d)(1) (notice to governmental agencies), and 49 C.F.R. §§ 1105.7 and 1105.8 (environment and historic report), had been met. (Def.'s Mot. for Summ. J. Ex. 1 at 1, ECF No. 72-1).

The STB originally scheduled the exemption to become effective on May 18, 2019. (Def.'s Mot. for Summ. J. Ex. 5 at 1 (ALAB Extension Request)). However, in a decision served one day before on May 17, the STB issued a Notice of Interim Trail Use ("NITU") to allow the Monroe County Commission ("MCC") to negotiate with ALAB for trail use until November 13, and to permit public use negotiations for one-hundred eighty days, until November 14. (Pls.' Mot. for Summ. J. Ex. A, ECF No. 70-1 (NITU)); *see* 49 C.F.R. § 1152.29.[5] In the same decision, the STB ordered that ALAB's abandonment authority was subject to a Section 106[6] condition and prohibited ALAB from filing its consummation notice or initiating any salvage activities related to abandonment—including removal of tracks and ties—until the Section 106 process was completed and the STB had removed this condition. (*Id.*). In a subsequent decision served September 3, the STB removed the Section 106 historic preservation condition but added a salvage condition. (Def.'s Mot. Ex. 4 at 2, ECF No. 72-4 (STB Removing NHPA Condition)).

ALAB and MCC's NITU negotiations for the Line proved unsuccessful. (*See* Def.'s Mot. for Summ. J. Ex. 7 (Pls.' STB Letter, STB Docket No. AB 1324) at 2, ECF No. 72-7; *see also* Jt. Notice 1, ECF No. 12, Case No. 19-756). The public use condition expired on November 14, 2019, (Pls.' Mot. for Summ. J. Ex. A (NITU)), with no trail-use agreement. Despite this barrier,

---

[5] Under the Trails Act, qualified private organizations or public agencies may intervene to railbank the corridor before abandonment is consummated. 16 U.S.C. § 1247(d). The railbanking intervention process allows a railroad to negotiate with the intervening entity, which would then assume financial and managerial responsibility for the corridor by operating it as a recreational trail. 28 A.L.R. Fed. 3d Art. 6 (2018) (citing *Preseault v. Interstate Com. Comm'n*, 494 U.S. 1, 6–7 (1990) ("*Preseault I*")).

[6] Under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108 ("NHPA"), federal agencies must determine whether a proposed undertaking will have an adverse effect on historic resources. 54 U.S.C. § 306108; 36 C.F.R. § 800.5(a). In rail line abandonment proceedings, the STB—when recommended by its Office of Environmental Analysis—may impose a historic preservation condition to meet the STB's obligations under Section 106. *See Consummation of Rail Line Abandonments That Are Subject to Historic Preservation and Other Environmental Conditions*, STB Ex Parte No. 678, 2008 WL 1815592 (Apr. 16, 2008).

ALAB sought alternative sponsors to gauge interest in railbanking. (Def.'s Mot. for Summ. J. Ex. 5 at 2). On April 8, 2020, ALAB sent a letter to the STB requesting a one-year extension to the notice of consummation's filing deadline. (*Id.*). At the time of the letter, ALAB "consider[ed] whether to consummate part of the Line, retain part of the Line, and railbank other parts[,]" and undertook "preparations for salvage in the event trail use is unsuccessful." (*Id.*). Negotiations and salvage preparations were apparently thwarted by the COVID-19 outbreak, but ALAB believed that an additional year would allow sufficient time to get things moving. (*Id.*). The STB granted ALAB's extension request. (Def.'s Mot. for Summ. J. Ex. 8, ECF No. 72-8).

On October 21, 2020, before abandonment was consummated, Alabama Railroad, LLC ("ARL"), notified the STB that it had "agreed to purchase [the Line] from [ALAB]" and that upon closing of the sale, it would "assume all common carrier obligations for the line, and . . . be responsible for its operation." (Def.'s Mot. for Summ. J. Ex. 9 at 2, ECF No. 72-9 (Notice of Acquisition)). On November 6, the STB authorized ARL to act as ALAB's successor in interest, thereby assuming common carrier obligations and operational responsibility for the Line. (Def.'s Mot. for Summ. J. Ex. 10, ECF No. 72-10 (STB Acquisition Approval)). The STB's decision noted that "[u]pon consummation of the sale, ALAB's abandonment authority would no longer be effective." (*Id.*). Subsequently, on December 22, ARL completed its purchase of the Line for $1,035,000. (Def.'s Mot. Ex. 11, ECF No. 72-11 (Quitclaim Deed from ALAB to ARL)).

On July 26, 2022, nineteen months after purchasing the Line, ARL filed a new Petition for Exemption to abandon the Line. (Def.'s Mot. for Summ. J. Ex. 14, ECF No. 72-14 (STB Decision – ARL Abandonment Exemption)). In its Petition, ARL stated that since its purchase from ALAB, ARL had not moved any local traffic over the Line, there was no overhead traffic, and the Line was "stub-ended," meaning that overhead traffic could not exist. (*Id.*; Def.'s Mot. for Summ. J. Ex. 12, ECF No. 72-12 (ARL Abandonment Exemption)). ARL further expressed doubts that future demand for service on the Line would materialize, "particularly at volumes that would warrant restoring operations," and that it "anticipate[d] salvaging some or all of the Line's track assets." (*Id.*). On July 26, the STB issued a Notice of ARL's Petition for Exemption and instituted abandonment proceedings under 49 U.S.C. § 10502(b). (Def.'s Mot. for Summ. J. Ex. 14 (STB Decision – ARL Abandonment Exemption)). To date, a NITU has not been issued.

  B.  *Litigation History*

On June 14, 2019, almost one month after the STB issued the NITU, Plaintiffs brought this takings action based on the Trails Act. (Compl. ¶¶ 2–5, ECF No. 1).[7] On February 14, 2020, Plaintiffs' claims were consolidated with similarly situated claims, but have since been unconsolidated. (ECF No. 24). From August 2019 through March 2020, the parties engaged in the "claims book" process where the United States made several objections: (1) that certain Plaintiffs did not own the subject property on the date of taking; (2) that some properties did not abut the rail-trail corridor; (3) that some source instruments conveyed fee simple to the railroad, thus leaving those Plaintiffs with no cognizable property interest in the rail corridor; and (4) that

---

[7] Plaintiffs amended their Complaint three times. (ECF Nos. 5, 10, 15). The operative pleading is Plaintiffs' Third Amended Complaint, (Third Am. Compl., ECF No. 15).

4

for all of the properties, the STB's issuance of a NITU did not effect a taking. (Def.'s Mot. for Summ. J. Ex. 15, ECF No. 72-15 (Claims Book Objections)). Although these issues remain uncertain, they are not the subject of the Motions before the Court. Instead, the parties seek judgment despite these unresolved issues.

This case has survived multiple stays due largely to the evolving landscape of Rails-to-Trails litigation. During and after the claims book process, the parties were unclear as to whether there would be a trail-use agreement and whether ARL would ultimately abandon the corridor. (*See* Jt. Notice 1; Jt. Prelim. Status Rpt., ECF No. 13). Those questions turned in part on whether the United States Supreme Court would grant certiorari to review the Alabama Supreme Court's decision in *Monroe Cnty. Comm'n v. Nettles*.[8] The parties presumed that should the *Nettles* decision be reversed, MCC may have been willing to sponsor the trial. (*See* Notice, ECF No. 19). Judge Firestone stayed litigation pending the Supreme Court's decision to review *Nettles*. (*See* Order Staying, ECF No. 21). That stay lasted from December 2019 through February 2020 when the United States Supreme Court denied certiorari.

Once trail negotiations halted, the legal questions in the case narrowed as to whether the circumstances here effected a taking and, if so, the duration of the taking. The parties agreed that the then-pending Federal Circuit panel decision in *Caquelin v. United States* ("*Caquelin III*"), 959 F.3d 1360, (Fed. Cir. 2020), would help resolve the duration issue. (*See* Jt. Status Rept., ECF No. 23). Thus, the predecessor Judge stayed the case from February through September 2020, when the Federal Circuit's panel released its decision in *Caquelin*. (Order Staying and Consolidating, ECF No. 24).

The parties explored settlement using a joint appraiser from October 2020 to July 2021. (*See generally* Jt. Status Rpts., ECF Nos. 22, 24, 26, 28, Case No. 19-756). The complexion of the case shifted when ALAB sold its interests to ARL, clarifying that ALAB would not consummate abandonment. (Jt. Stats Rept., ECF No. 31, Case No. 19-756). At that point, settlement discussions stalled, and the parties agreed that briefing the issues of causation and duration of the taking was necessary. (*Id.*). Between July 2021 and February 2022, the parties conducted discovery on causation. (ECF No. 33, Case No. 19-756).

In February 2022, following the close of discovery but prior to the entry of a briefing schedule, the parties requested that the Court hold summary judgment briefing on causation in abeyance while they *again* attempted settlement; that request was granted. (ECF No. 55, 56, Case No. 19-756). From February to April 2022, the parties resumed settlement negotiations, leading to a second round of discussions. This time, they succeeded in reaching a tentative agreement on just compensation for certain plaintiffs whom the parties agreed, for settlement

---

[8] The Court in *Nettles* held that the owner of a railroad right-of-way abandoned the right-of-way under Alabama common law as opposed to federal law and affirmed the decision of a lower court to quiet title in favor of the servient landowners. *Monroe Cnty. Comm'n v. Nettles,* 288 So. 3d 452, 462 (Ala. 2019). Opponents to *Nettles* cite the strong dissent expressing concern that the Court ignored both former Alabama Supreme Court precedent on this issue and the Trails Act, running afoul of federal preemption. *Id.* at 462–67 (Parker, C.J., dissenting).

purposes, possessed title. (ECF Nos. 57, 59, Case No. 19-756). However, the parties were unable to reach an agreement as to attorney's fees and costs. (ECF No. 59, Case No. 19-756). Despite this failure, the United States requested the Court to continue the stay as to briefing pending the Federal Circuit's then-pending panel decision in *Memmer v. United States*. *See* 50 F.4th 136 (Fed. Cir. 2022). The Court agreed that the stay was appropriate given that the causation issues in *Memmer* mirrored those presented here. (ECF No. 63, Case No. 19-756). The Circuit issued its decision in *Memmer* in October of 2022 and the parties attempted to come to an agreement based on the Circuit's holding. (ECF No. 67, Case No. 19-756). The third time was not the charm. (*See id.*). Within this meandering journey, the parties present their claims for judgment.

## II.   Discussion

Plaintiffs assert that the issuance of a NITU prevented them from obtaining fee simple ownership in the land beneath the railroad lines covered by the NITU and that, consequently, they are owed just compensation under the Fifth Amendment. (*See generally* Third Am. Compl.; Pls.' Mot. for Summ. J.). Conversely, the United States maintains that there is no evidence ALAB would have abandoned the Line in the absence of the NITU, and even if it would have, conditions imposed by the NITU prohibited it from doing so. (*See* Def.'s Mot. for Summ. J.). The Court considers these claims against the backdrop of relevant rails-to-trails litigation.

### A.   Standard of Review

The Court may grant summary judgment if the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine factual dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party seeking to establish a genuine dispute of material fact must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations [ ], admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A).

While "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), summary judgment may still be granted when the party opposing the motion submits evidence that "is merely colorable . . . or is not significantly probative." *Anderson*, 477 U.S. at 251 (internal citation omitted). Courts may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita, Elec. Indus. Co., Ltd. v. United States*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). In its discretion, a trial court is permitted to deny even a well-supported motion for summary judgment if it believes the case would benefit from a full hearing. *United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292 (11th Cir. 1991).

B.     *The Wayside of Rails-to-Trails Case Law*

In Trails Act cases, a taking occurs when government action destroys state-defined property rights either "by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement[.]" *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010). This also occurs by compelling the continuation of a railroad-purposes easement to accommodate negotiations for a trail-use agreement, even if the negotiations are ultimately unsuccessful. *See id.* at 1025; *see also Caquelin III*, 959 F.3d at 1364, 1367.

A corridor in railbank status has not been abandoned, thus the property—even if acquired by an easement for railroad purposes—does not revert to the landowners. *See* 49 C.F.R. § 1152.29(d)(1). This process matters in Federal Courts when abutting landowners bring litigation asserting that the operation of the Act prevents them from reclaiming their reversionary interests in the land. Whether a plaintiff is entitled to compensation depends on meeting two prongs of a three-pronged test. As the Federal Circuit set out in *Preseault II*, Courts must determine:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; **[AND]**
>
> (2) if the Railroad acquired only easements, if the terms of the easements were limited to use for railroad purposes, then the authorization for future use as public recreational trails constituted a taking [i.e., exceeds the scope of the easements]; **[OR]**
>
> (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, if the easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements then a taking occurred [i.e., abandonment of the easement].

100 F.3d 1525, 1550 (Fed. Cir. 1996) ("*Preseault II*") (en banc) (emphasis added); *see also Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009). In recent years, the Federal Circuit further developed jurisprudence in rails-to-trails cases. It is now well-settled that the issuance of a NITU under the Trails Act may result in a taking of property owned by the original grantor of the easement, though more is needed to effectuate a taking on its own. *See e.g., Caldwell v. United States*, 391 F.3d 1226, 1230 (Fed. Cir. 2004) (internal citations omitted).

The STB's issuance of a NITU forestalls the full abandonment of the railroad line, and therefore constitutes "the government action that prevents the landowners from possession of their property unencumbered by the easement." *Ladd*, 630 F.3d at 1023*; accord Caquelin III*, 959 F.3d at 1367 ("The NITU . . . was a government action that compelled continuation of an easement for a time; it did so intentionally and with specific identification of the land at issue; and it did so solely for the purpose of seeking to arrange, without the landowner's consent, to continue the easement for still longer, indeed indefinitely, by an actual trail conversion."); *Barclay v. United States*, 443 F.3d 1368, 1374 (Fed. Cir. 2006) ("The barrier to reversion is the NITU, not physical ouster from possession."); *Caldwell*, 391 F.3d at 1233–34 ("The issuance of the NITU is the only government action in the railbanking process that operates to prevent

abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way.").

Relevant here, no trail-use agreement was reached. If the parties do not reach an agreement, the railroad may exercise its STB-granted authority to abandon the line. 49 C.F.R. § 1152.29(d)(1), (e)(2); *see also Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150–53 (D.C. Cir. 2001). In *Ladd*, the Federal Circuit held that in cases where no trail-use agreement is reached, but the NITU compels the railroad to delay its abandonment, the issuance of a NITU may effect a temporary physical taking. 630 F.3d at 1023–24. In *Caquelin III*, the Circuit clarified whether the issuance of a NITU alone can trigger a taking and the legal standard for "the timing of a NITU-based taking." 959 F.3d at 1370–71. The Circuit explained that, because a railroad's easement would remain in place absent abandonment by the railroad, there could be no taking until the time, had there been no NITU, the railroad would have abandoned the rail line. *See id.* at 1371–72.

Stated differently, "a NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU." *Caquelin III* at 1363. "[I]n such a case, the NITU takes nothing from the landowner that the landowner would have had in the absence of the NITU." *Id*. Finding for the *Caquelin* plaintiffs, the Federal Circuit emphasized that the government had not "point[ed] to any evidence at all affirmatively indicating that the railroad would have delayed abandonment past [the issuance of the NITU]." *Id.* at 1373.

In 2022, the Federal Circuit addressed and reaffirmed *Caquelin III* in *Memmer*. There, the Court of Federal Claims determined that landowners established the railroad would have abandoned rail lines in the absence of the NITU. 50 F.4th at 142–44. The trial court relied on facts regarding the railway's initiation of the abandonment process by filing a notice of exemption which indicated that no local traffic had moved over the lines for at least two years and specified a date to consummate abandonment of the lines. *Memmer v. United States*, 150 Fed. Cl. 706, 761 (2020). On appeal, the Federal Circuit affirmed the NITU effected a taking and reaffirmed its holding in *Caquelin*. The Federal Circuit stated that "to determine if a NITU has effected a taking, we must consider whether the railroad would have abandoned the line, i.e., relinquished its rights to the rail right-of-way, during the period of the NITU had there been no NITU." 50 F.4th at 145. The Federal Circuit concluded that the Court of Federal Claims' findings were sufficient in showing that the railroad "had every intent to abandon the railroad lines during the period of time that the NITU was in effect and was prevented from doing so by the existence of the NITU." *Id.* The Circuit explained that the United States failed to show the trial Court "erred in finding the evidence that [the railroad] would have relinquished its rights to its right-of-way during the NITU period outweighed the evidence to the contrary." *Id.*

This brings the Court to consider the types of evidence that raise the presumption of abandonment. *Caquelin III* stoked a fire in the Court of Federal Claims, sparking much analysis of the types of evidence that trial courts should consider in examining a railroad's intent in a hypothetical world without the NITU. This Court deems that evidentiary test as "NITU plus." The question of what constitutes a "plus," remains pulpous, at best. *Hardy II* confronted the Court of Federal Claims with the "apparently rare situation in which the Notice of Exemption and NITU, documents that would suggest an intent to abandon in most cases, [were] actively

8

contradicted by other evidence." *Hardy v. United States*, 153 Fed. Cl. 287 (2021) ("*Hardy II*"), *reconsideration denied*, 156 Fed. Cl. 340 (2021). On remand from the Federal Circuit, *Hardy II* identified three relevant factors for examining the railroad's intent. *Id.* at 293–96.

First, the Court examined the railroad's STB filings that demonstrated the railroad incorrectly described the railroad it "intended" to abandon. *Id.* at 294–95. Although not dispositive, the Court found that such an error occasioned a finding that the railroad did not intend to abandon. *Id.* at 295. Second, the Court examined the railroad's explanation of its intent via deposition. *Id.* To that point, the railroad's designated deponent testified that the railroad "did not intend at any point to abandon the [disputed portion of the line]." *Id.* Third, the Court examined the railroad's actions with the disputed portion of its line. *Id.* at 296. Proximate to the purported abandonment, the railroad sought a new, decade-long operator lease that would continue long past the NITU issuance date. *Id.* at 296. Rather than support an intent to abandon, "the time, effort, and financial resources invested in the track at issue demonstrate[d] [the railroad's] dominion and control over that portion of the line." *Id.* Ultimately, *Hardy II* found that the railroad's actions weighed heavily against a finding of abandonment. *Id.*

Recently in *Sauer W. LLC v. United States*, the Court of Federal Claims explained that if takings plaintiffs provide evidence indicating the railroad's intent to abandon its corridor, the government must provide evidence affirmatively indicating that the railroad would have delayed abandonment beyond the NITU period. 157 Fed. Cl. 619, 636 (2022). Also illuminating is *Blevins v. United States* where another judge of this Court concluded that issuing a NITU raises a presumption that the railroad owner would have abandoned the right-of-way absent a potential conversion.158 Fed. Cl. 295, 306 (2022). *Blevins* held that the United States bears the burden of demonstrating that the railroad owner would not have abandoned the right-of-way in the absence of a NITU. *Id.* In some instances, the presumption that a railroad owner who begins the abandonment process intends to abandon the line may be overcome by evidence indicating that the abandonment process was initiated by mistake or by conduct demonstrating that the railroad had no intention of abandonment. *Id.* at 308 (citing *Hardy II*, 153 Fed. Cl. at 294 (addressing the rare situation when the Notice of Exemption and NITU are contradicted by other evidence)).

Outside of mistake, *Blevins* states that the Court may consider other factors relevant to determining intent—this extends to the railroad's filings with the STB, the railroad's explanation of its intent, and its actions with the disputed portion of its line. *Id.* at 308–09.

   C.  *A world without the NITU is simply unclear.*

     1.  <u>It is unclear whether ALAB would have abandoned its corridor in the absence of the NITU.</u>

The United States asserts that the evidence shows ALAB would not have abandoned the Line during the NITU period. (Def.'s Mot. for Summ. J. at 28). It maintains that Plaintiffs are fashioning a misplaced causation standard and using an inaccurate timeline. (*Id.*). Plaintiffs argue that the opposite is true, stating that the record demonstrates ALAB's clear intent to abandon. (Pls.' Mot. for Summ. J. at 13). The Court finds that the competing evidence demonstrates genuine issues of material fact to be resolved at trial.

As an initial matter, the United States makes waves about Plaintiffs' phrasing, emphasizing that the Court should consider ALAB's intent "in the absence of the NITU," rather than solely "at the time of the NITU." (Def.'s Mot. for Summ. J. at 20). The difference is negligible. *Sauer W. LLC* persuasively states that *Caquelin III* "clarified that a court must consider events occurring before, during, and after the NITU issues when assessing the railroad's intent at the time of the NITU[]" because each is "relevant when assessing the railroad's intent [to abandon or not], but it is the railroad's intent *at the time of the NITU* that matters." 157 Fed. Cl. at 634, 636 (emphasis added).

We know the following facts. On March 29, 2019, ALAB filed a notice of exemption to abandon rail service over the line. (Def.'s Mot. for Summ. J. Ex. 1 at 1; Pls.' Mot. for Summ. J. Ex. B, ECF No. 70-2). In its notice of exemption, ALAB certified (among other things) that no local or overhead traffic had utilized the Line for at least two years and that it could reroute any overhead traffic over other lines. (*Id.; see also* Transcript of Oral Argument ("Tr.") 25:17–19 (DOJ: "[T]here's no dispute that the railroad has not been used for common carrier freight service for the past two years."), ECF No. 28). As Plaintiffs point out, the Court must take ALAB for its word. (Tr. 14:13–16 ("[Y]ou almost have to take the railroad for its word when it says ["]we want to abandon this stretch["] and it comes to the STB and verifies that it intends to abandon a stretch[.]")). We also know that the NITU issued on May 17 allowed trail-use negotiations between MCC and ALAB. (Pls.' Mot. for Summ. J. Ex. A, (NITU)). In the same breath, however, the STB stated that abandonment authority was subject to additional conditions prohibiting ALAB from filing its consummation notice or initiating any salvage activities related to abandonment. (*Id.*). The STB's implementation of a prohibition *against* abandonment favors Plaintiffs' argument.

The United States asserts that Plaintiffs incorrectly assign significance to the fact that for the six months that the NITU was in effect, ALAB attempted to negotiate a trail-use agreement with MCC, because "negotiating for trail use, if successful, ultimately leads to railbanking, not abandonment." (Def.'s Mot. for Summ. J. at 27). This position is unpersuasive because the parties have apparently agreed that the easement granted to ALAB was specific to railroad purposes. Thus, a successful trail-use agreement would still lead to a taking.

As to post-expiration occurrences, the United States believes Plaintiffs conflate ALAB's lack of "intention to hold onto its right"—i.e., its motivation to sell—with an intent to abandon during the period of the NITU. (Def.'s Mot. for Summ. J. at 30). Even though ARL bought the Line, ALAB's post-NITU actions are not indicative of its intentions during the NITU period, because such actions may have been prompted by information or circumstances that emerged after the NITU expired. *See Caquelin III*, 959 F.3d at 1370–71 (focusing on whether the railroad company would have abandoned its line "during the NITU" period). This also applies to the fact that ALAB never consummated abandonment.

Among other gaps in the record, ALAB's intent to abandon is simply vacant without the STB docket entries and filings. Conspicuously missing from the record is any statement or averment by an ALAB representative that would further bolster Plaintiffs' position. It is certainly a compelling start, but this is not decisive enough for a summary judgment ruling. In considering a "NITU plus" standard, it is difficult for the Court to conclusively separate what the United States deems "boilerplate language," (Tr. 24:23–25), necessary for NITU issuance and the NITU

10

itself. Stated differently, it is unclear whether the affirmations railroad companies make satisfy the "plus" or whether this is just part of the typical NITU process.

To the United States' credit, the Court cannot ignore the contract that ARL apparently inherited from ALAB. ARL inherited a storage contract that ALAB executed with Top Rail Solutions for car storage, which likely qualifies as use for a railroad purpose. (Def.'s Mot. for Summ. J. Ex. 6, ECF No. 72-6 ("ARL Depo.") 84:10–85:24 (ARL "got [the agreement with Top Rail Solutions] assigned to us and they have always had railcars on the line"); 143:6–19 ("[T]here were 90-some [cars] on the line when we [(ARL)] acquired it"); 170:20–22 (At the time ARL purchased the Line ALAB "had existing railroad operations ongoing. The entire 47 miles was an active rail line.")). Even though ARL's representative had little helpful information about the state of the track, whether ALAB was still using the line for rail purposes immediately before or during the NITU period is a genuine issue of material fact. (*See* Def.'s Mot. for Summ. J. Ex. 6 at 22:11–19 (Deposing attorney: "What's your understanding of the physical condition of this rail line at the moment?" ARL Representative: "We are only concerned with what we operate right now. We've done some wash-out repairs, need spray, some general maintenance and things like that. So we've done maintenance since we took over. But in terms of the remainder of the condition of the track, I wouldn't know specifically.")). This is precisely the type of evidence that Plaintiffs acknowledge may shed light on ALAB's intent. (Tr. 13:9–15 (Pls.' Counsel: "So to the extent you do want to look at events after the NITU, that's only really in the context of looking at it to see does this shed any light on what the railroad's intent was as of this date, as of the NITU date. So to the extent that you can infer anything from post-NITU events, that's where you could look[.]")). Issues created by the ARL deposition are significantly probative. *See Loveridge v. United States,* 150 Fed. Cl. 143, 150 (2020) ("[E]xisting use agreements between the [railroad] and third parties suggest that the [railroad] intended to retain . . . an interest in the easements . . . [which is] conduct inconsistent with an intent to entirely abandon[.]") (citing *Romanoff Equities, Inc. v. United States*, 119 Fed. Cl. 76, 83 (2014)).

Based on the available facts, it remains inconclusive whether ALAB intended to abandon the railroad lines during the period when the NITU was in effect and whether the NITU's existence prevented them from doing so. Therefore, the Court finds that trial is necessary to determine whether a taking has occurred, and judgment for either party as a matter of law is not warranted. The Court next analyzes whether ALAB *could* have consummated abandonment with the conditions in place.

        2.    <u>Conditions and requirements imposed on the railroad cannot preclude a taking.</u>

The United States asserts that abandonment would have been statutorily impossible and, "[b]ecause the test is whether the railroad would have abandoned during the period of the NITU if not for the STB's issuance of the NITU, other legal prohibitions on abandonment that exist independent of the NITU eliminate any claimed causal connection." (Def.'s Mot. for Summ. J. at 22). One day before the proposed consummation date, the STB informed ALAB that it was prohibited from taking any steps that may alter the historical integrity of the site, nor could ALAB "file its consummation notice or initiate any salvage activities related to abandonment (including removal of track and ties) until the Section 106 process has been completed and the [STB] has removed this condition." (Pls.' Mot. for Summ. J. Ex. A (NITU) at 4). These

11

conditions operated independently from the NITU to prohibit ALAB from consummating abandonment while the conditions were in effect. (*See id*.). Whether these conditions preclude a taking is not a novel issue. The Court finds that the extraneous prohibitions imposed on the railroad could not preclude a taking.

First, the United States asserts that there could be no abandonment because the statutory scheme does not provide for it. However, this is circular as it applies to the second prong of *Preseault II*. If such an assertion were true, there could never be causation under the current rails-to-trails legislation. This Court is simply unwilling to support such a proposition. In support of its position, the United States points to ALAB's April 8, 2020 filing with the STB wherein it noted that its "salvage preparations are still ongoing" five months after the NITU's expiration because "the COVID-19 outbreak has created further delays." (Def.'s Mot. for Summ. J. at 23 (citing ALAB Ext. Req.)). Yet these events occurred *after* the NITU was issued and expired. While occurrences after the NITU may have some weight, it is nonsensical to deduce the railroad's intent from the aftermath of a NITU when the standard, as the United States points out, is in the absence of a NITU. Further, though interesting, this Court is not an expert on salvaging railroads. A finding as to whether ALAB could have taken the necessary steps to consummate abandonment based on its ability to salvage the railroad is outside this Court's purview.

As to the NHPA conditions imposed by the STB, the Court recently inferred that "the existence of a concurrent historic preservation restriction at the same time a NITU is in effect does not extinguish the causal link that would otherwise give rise to takings liability." *Hippely v. United States*, 162 Fed. Cl. 414, 427–29 (2022). While this finding is not binding, its analysis is sound. In *Hippely*, in the face of a competing NHPA condition, the Court held that causation is about intent and the conditions at the time of the NITU, not the order in which the conditions expire. *Id. Hippely* clarifies that if compensation is owed when only part of the NITU period is encumbered by a historic preservation condition, then the entire NITU period should be compensable, even if the condition extends beyond the NITU's duration. *Id.* at 426. Logic from previous cases guided this decision to "maintain consistency with prior caselaw." *Id. (citing Balagna v. United States*, 145 Fed. Cl. 442, 443–44 (2019)); *Blevins*, 158 Fed. Cl. at 312). Both *Balagna* and *Blevins* presented situations where historic preservation conditions and NITUs were issued concurrently, and the Court of Federal Claims still found a taking in favor of the landowners. *See Balagna*, 145 Fed. Cl. at 443–44; *Blevins*, 158 Fed. Cl. at 312 ("That CSXT has not yet completed tasks required under the [NHPA] to abandon a railroad does not impact the causation analysis because Defendant has not shown that CSXT would have also delayed this process in the hypothetical world where a NITU never issued.").

The facts of the NHPA condition are undisputed. While the condition was in effect, ALAB was prohibited from initiating any salvage activities related to abandonment, including the removal of tracks or ties, but the public use condition did not contain such a prohibition. (*See* Pls.' Mot. for Summ. J. Ex. A (NITU) at 4)*.* The STB removed the NHPA condition on September 3, 2019—approximately two months before the NITU's expiration—but the public use condition did not expire until the day *after* the NITU's expiration. (*Id.*). The United States essentially argues that the conditions imposed by the NITU concurrently relieve the NITU from effecting a taking. This becomes problematic when such a condition also prohibits a railroad company from taking steps to abandon the easement. The United States' position introduces the exact scenario that Judge Holte identified as troubling in *Hippely*—if an NHPA condition

imposed beforehand hinders causation and in turn prevents a taking, the government could cite any historic condition to evade liability in rails-to-trails cases.

As to whether the specific conditions imposed by the NITU precluded a taking, the Court determines that it has no effect. Therefore, the Court finds that ALAB *could* have commenced abandonment if it had the requisite intent to do so.

> D.  *Prong III of Preseault is inapplicable under these facts.*

The second issue before this Court relates to state law abandonment under the third prong of *Preseault II*—whether the easement was abandoned prior to the alleged taking thereby granting the property owners at that time unencumbered fee simples, leading to the occurrence of a taking. Plaintiffs argue that ALAB stopped using the right-of-way for railroad purposes before 2017 and, therefore, abandoned the right-of-way before the issuance of the NITU and before its sale to ARL under Alabama law. *See Nettles*, 288 So. 3d at 455–59 (affirming the trial court's holding that a railroad abandoned its line under Alabama law after two years of non-use and the filing of both a Petition for Exemption and a NITU). Therefore, Plaintiffs believe that the United States is alternatively liable due to the prior abandonment of the railroad.

According to documents used in support of the United States' Motion and its concessions for purposes of this Motion, all Plaintiffs own the adjacent land in fee simple and it is undisputed that ALAB solely possesses an easement for railroad purposes. (Def.'s Mot. for Summ. J. at 3). Thus, the Court operates under that assumption, though the source deeds are conspicuously missing from the parties' briefing. The Court finds that any analysis of this prong is unwarranted. Prong 3 of *Preseault* applies when the grants of the railroad's easements were broad enough to encompass recreational trails. That is not the case here. Both parties concede that, in these circumstances, there are no issues as to title and the easement granted to the railroad was restricted to railroad purposes.

> E.  *Taking Duration*

In *Memmer*, the Federal Circuit addressed the duration of a taking. 50 F.4th at 146 ("We agree with the government that the taking ended upon expiration of the NITU . . ." because "it was on that date that the United States was no longer responsible for mandating the continuation of the easement because, from that point forward, the decision rested solely in the hands of [the railroad company]."). Here, there has only been one NITU in place—the 180 days between May 17 and November 19, 2019. At any rate, the parties report that for purposes of their Motions, this issue is now moot. (Tr. 5:23–6:3 ("Now, the parties have conferred . . . and we have agreed tentatively to just compensation amounts and duration of the taking, that includes a stipulation as to the nature of the interest involved for purposes of settlement, so those issues are resolved."); Tr. 8:4–8 (Court: "Is this [a] temporary or permanent [taking]?" Pls.' Counsel: "This is a temporary taking case." Court: "One hundred and eighty days?" Pls.' Counsel: "Yes.").

> F.  *Prohibition Against Advisory Opinions*

As this case enters its fourth year of litigation, the parties present competing summary judgment claims while urging the Court to accept their stipulation—for dispositive briefing only—that there are no title issues and the easements are limited to railroad purposes. In other

13

words, were the Court to resolve the issues raised in their respective Motions, the parties would then be at liberty to revisit fundamental standing and entitlement issues, potentially leading to another round of dispositive briefing. (Tr. 6:10–29 (Court: "I don't see any source [d]eeds in the records that I've been given in this case, and I'm asked to basically assume for the purposes of this hearing, you guys have had some stipulations about ownership and stuff and you want me to assume for the purposes of this hearing. I don't want to do that. I mean, we're, what, three, four years in, and you're asking me to assume for the purposes of this hearing but not willing to be bound for the rest of the case, meaning we may revisit those kinds of issues?")). This effectively means that any decision the Court makes may not be conclusive, which is concerning and approximates an advisory opinion.

Article III of the Constitution restricts the jurisdiction of federal courts to "cases" and "controversies." *Flast v. Cohen*, 392 U.S. 83, 94 (1968). The purpose of this limitation is to restrict the "business of the federal courts to questions presented in an adversary context" and historically resolvable "through the judicial process." *Id.* As a result, where parties seek only an advisory opinion, the matter is non-justiciable. *Id*. The prohibition of advisory opinions is a constitutional limit on the power of the courts. *Id.* at 96; *see* U.S. Const. art. III, § 2, cl. 1. Judicial opinions that involve hypothetical facts are advisory. *Hodgson v. H. Morgan Seafoods, Inc.* 433 F.2d 918, 920 (5th Cir. 1970). In sum, courts should not answer questions of law "divorced from the facts of the case . . . and broader than necessary to resolve that case." *In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 205 (5th Cir. 2018).

Practically speaking, the practice of issuing advisory opinions undermines the fundamental principles of the judicial system and poses significant risks to the separation of powers. Advisory opinions typically address hypothetical scenarios or abstract legal questions without a specific case or controversy. Courts should not issue opinions premised on hypothetical or abstract facts. *Bell v. State of Maryland*, 378 U.S. 226, 237 (1964). The absence of a concrete case undermines the Court's capacity to render a fair and informed decision by depriving it of essential factual context. Courts thrive on real-world scenarios where opposing parties present their arguments, evidence is examined, and the Court can consider the full range of relevant factors before issuing a ruling. Advisory opinions lack the context necessary to ensure the quality and integrity of the judicial decision-making process.

Further, the process of issuing advisory opinions often lacks the mechanisms for accountability that are in place for regular court decisions. Advisory opinions may want for the same level of scrutiny inherent to traditional cases. This limited accountability can weaken the judicial system's integrity and diminish public trust in its ability to deliver fair and just outcomes. Not to mention that engaging in the practice of issuing advisory opinions diverts valuable time and resources away from resolving actual legal disputes and delivering justice in concrete cases. Prioritizing advisory opinions over real cases may lead to delays in the legal system, denying genuine seekers of justice their due.

Advisory opinions, even those that may only be binding to one party, pose significant risks to the judicial system's integrity. Rather than engaging in speculative exercises, courts should focus their efforts on resolving actual legal disputes, ensuring fairness, and upholding the rule of law. Thus, to ensure the binding effects of this Opinion, the Court will hear no dispositive motions on issues related to title or the type of easement granted to the railroad.

### III.   Conclusion

The Court finds that neither party has established whether ALAB would (or would not) have abandoned their interests if not for the NITU. Therefore, the Court finds that trial is necessary to determine whether a taking has occurred, making judgment for either party unwarranted. Consequently, both Motions for Summary Judgment are **DENIED**. The Court reiterates the schedule previously ordered before deconsolidation.

| Event | Deadline |
|---|---|
| Discovery Closes | August 1, 2023 |
| Status Conference | August 8, 2023, at 1:00 p.m. ET (location TBD) |
| Trial | October 16, 2023 |

**IT IS SO ORDERED.**



s/   David A. Tapp
DAVID A. TAPP, Judge